Argued and submitted May 13, 2002, at Crescent Valley High School, Corvallis, vacated and remanded in part; otherwise affirmed June 12, 2003

STATE OF OREGON,
*Respondent,*

*v.*

ANTHONY JOHN SLOVIK,
*Appellant.*

00CR0023; A111274

71 P3d 159

Robin A. Jones, Senior Deputy Public Defender, argued the cause for appellant. With her on the brief was David E. Groom, Public Defender.

Jennifer S. Lloyd, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Kistler, Presiding Judge, and Linder and Brewer, Judges.

KISTLER, P. J.

**KISTLER, P. J.**

Defendant appeals from a judgment of conviction for manufacturing, delivering, and possessing methamphetamine. He argues, among other things, that the trial court erred in imposing enhanced sentences on those offenses because each offense involved 10 grams or more of "a mixture or substance containing a detectable amount of methamphetamine." *See* ORS 475.996(1)(a)(C); ORS 475.996(2)(b)(C).[1] We reverse and remand for resentencing.

While performing a valid search on June 30, 1999, police officers found items associated with manufacturing methamphetamine. Among other things, they found a gallon jar with liquid in it, two plastic soda pop bottles with residue, a large brown jar, and numerous pseudoephedrine bottles.[2] One of the jars contained a two-layer liquid, the top layer of which was toluene—a solvent that is evaporated in the methamphetamine manufacturing process. Although laboratory tests revealed that the toluene contained methamphetamine, the tests did not determine the weight of the pure methamphetamine contained in the solvent. Rather, they determined that the solvent and methamphetamine together weighed 7.75 grams.

A second jar contained a three-layer liquid. One layer contained chemicals that had been extracted out of the solvent, tested positive for methamphetamine, and weighed 5.8 grams. The second layer, a solution of oil, water, and a brown substance, also tested positive for methamphetamine and weighed 37.4 grams. The third layer, a crystalline substance, contained no trace of any controlled substance. The liquids that tested positive for methamphetamine were in the manufacturing process; that is, the liquids required additional processing to create usable methamphetamine. Until that occurred, the liquids were poisonous to ingest.

---

[1] Unless otherwise stated, the citations refer to the 1997 statutes.

[2] Pseudoephedrine is extracted from pseudoephedrine tablets and used to manufacture methamphetamine.

The state charged defendant with, among other things, manufacturing, delivering, and possessing methamphetamine. The indictment alleged that each of those three charges—manufacture, delivery, and possession—involved 10 or more grams of "a mixture or substance containing a detectable amount of methamphetamine"—an allegation that made defendant eligible for an enhanced sentence under ORS 475.996(1)(a)(C) and (2)(b)(C). At the close of the state's case, defendant moved for a judgment of acquittal because the state failed to prove that the liquid containing methamphetamine was in a usable or saleable form.[3] He reasoned that, when the legislature provided for enhanced sentences for drug crimes involving 10 or more grams of a "mixture or substance containing a detectable amount of methamphetamine," it did so only for those mixtures or substances that were ready for sale and use. It did not intend, defendant asserts, to enhance a person's sentence for possessing 10 or more grams of a mixture or substance that was not in marketable form. The trial court denied defendant's motion, and he was convicted of manufacturing, delivering, and possessing methamphetamine. The court imposed an enhanced sentence on each of those convictions.

The issue that defendant raises on appeal is narrow. Defendant does not dispute that a reasonable juror could find that the liquid the officers discovered in the two jars weighed more than 10 grams and contained an unquantified amount of methamphetamine.[4] Conversely, the state does not argue that the methamphetamine that the officers found was in a usable or saleable form; that is, the state does not dispute that the manufacturing process was still ongoing when the officers found the liquid containing the methamphetamine. The question accordingly reduces to a legal issue: Did the

---

[3] Defendant also moved for a judgment of acquittal on count 13 charging him with conspiring to manufacture methamphetamine. He argued that the evidence was not sufficient to permit a reasonable juror to find that he had conspired with others. The trial court denied the motion, defendant assigns error to that ruling on appeal, and we affirm the trial court's ruling without discussion.

[4] Defendant did not argue below that neither ORS 475.996(1)(a)(C) nor (2)(b)(C) applied because the liquid contained only salts, isomers, or salts of isomers of methamphetamine; that is, defendant did not argue below that he did not manufacture, deliver, or possess methamphetamine, as opposed to its salts or isomers.

legislature intend to enhance a defendant's sentence for manufacturing, delivering, or possessing "a mixture or substance containing a detectable amount of methamphetamine" when the methamphetamine is not in marketable form?

Defendant contends that the statutory phrase "a mixture or substance" is limited to mixtures or substances that are market ready and in a useable form. He bases his argument in large part on *Chapman v. United States*, 500 US 453, 460, 111 S Ct 1919, 114 L Ed 2d 524 (1991), a case interpreting the federal sentencing guidelines on which Oregon's statute was modeled. Noting that the *Chapman* Court explained that the federal government had "adopted a 'market-oriented' approach to punishing drug trafficking, under which the total quantity of what is distributed * * * is used to determine the length of the sentence," *id.* at 461, defendant reasons that, when the Oregon legislature enacted ORS 475.996, it understood that the phrase "a mixture or substance" referred only to marketable mixtures or substances—typically mixtures or substances that result from diluting a pure drug with a cutting agent before offering it for sale.[5] The state responds that the text of the statute refers broadly to mixtures or substances containing a detectable amount of methamphetamine; nothing in the text of the statute limits its reach to those mixtures or substances that are marketable.

The parties' dispute turns on an issue of statutory interpretation, and we begin with the text and context of the relevant statutes. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610, 859 P2d 1143 (1993). ORS 475.996(1)(a) provides for an enhanced sentence if a conviction for manufacturing or delivery involves a specific amount of "a mixture or substance containing a detectable amount of" one of eight controlled substances. When defendant committed his crime, the relevant subparagraph provided for an enhanced sentence for a manufacturing or delivery offense that

---

[5] In this case, for example, the state's witness testified that, after the methamphetamine manufacturing process is complete and the methamphetamine is in the form of a dry powder, the powder is often mixed with a cutting agent such as Epsom salts before it is sold.

involved "[t]en grams or more of a mixture or substance containing a detectable amount of methamphetamine." ORS 475.996(1)(a)(C). ORS 475.996(2)(b)(C) similarly enhances a defendant's sentence for possessing "[t]en grams or more of a mixture or substance containing a detectable amount of methamphetamine."[6]

The texts of those subparagraphs do not expressly limit the type of mixture or substance that will warrant an enhanced sentence; that is, they do not specifically limit the phrase "a mixture or substance" to marketable mixtures or substances. Although the text, viewed in isolation, supports the state's position, the court has explained that a statute's context may reveal a different focus from its text, *State v. Stoneman*, 323 Or 536, 546, 920 P2d 535 (1996), and we turn to that inquiry.

Under ORS 475.996, "a mixture or substance" is something that a person either delivers, manufactures, or possesses. Those verbs shed light on the meaning of what is effectively their direct object, and we examine each verb separately. "Deliver" means "the actual, constructive or attempted transfer * * * from one person to another of a controlled substance." ORS 475.005(8). Delivery connotes the transfer of "a mixture or substance" that is ready for distribution or sale. Typically, a person does not deliver controlled substances until the manufacturing process has been completed and the completed product is capable of being ingested. Put another way, the legislature's use of the verb "deliver" implicitly qualifies the type of mixture or substance to which the statute refers—those mixtures or substances that are marketable. The same is true for possession. Typically, a person possesses controlled substances that are ready for use; that is, the crime of possession ordinarily refers to the possession of a completed product that is capable of ingestion. In the same way that the verb "deliver" implicitly qualifies

---

[6] As amended in 2001, ORS 475.996(1)(a)(C) refers to "[t]en grams or more of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers or salts of its isomers." *See* Or Laws 2001, ch 804, § 2. The legislature did not amend ORS 475.996(2)(b)(C). That subparagraph still provides for an enhanced sentence for persons who possess 10 or more grams of methamphetamine.

the phrase "mixture or substance," so does the verb "possess."[7]

The third verb "manufacture" points in a different direction. Manufacture means "the production, preparation, propagation, compounding, conversion or processing of a controlled substance * * * by means of chemical synthesis, or by a combination of extraction and chemical synthesis[.]" ORS 475.005(14). As we explained in *State v. Brown*, 109 Or App 636, 645, 820 P2d 878 (1991), *rev den*, 313 Or 210 (1992), the prohibition against manufacturing controlled substances "prohibit[s] not simply possession of the controlled substance created by the prohibited means, but [also] those acts that ultimately will result in the creation of a controlled substance." Used with that verb, the phrase "mixture or substance" would appear to refer not only to those mixtures or substances that are ready for distribution and use but also to those mixtures or substances that are still in the midst of the manufacturing process.[8]

Defendant also relies on the Court's opinion in *Chapman* as context. As defendant notes, ORS 475.996 was modeled on the federal sentencing statute, which the Court interpreted in *Chapman. See State v. Stockfleth / Lassen*, 311 Or 40, 50, 804 P2d 471 (1991) (explaining that "when Oregon adopts the statute of another jurisdiction, the legislature is presumed also to adopt prior constructions of the statute by the highest court of that jurisdiction").[9] As defendant also

---

[7] Consistently, ORS 475.996(1)(a)(F) enhances a sentence for manufacturing or delivering "[t]wo hundred or more user units of a mixture or substance containing a detectable amount of lysergic acid diethylamide," and ORS 475.996(2)(b)(F) enhances a sentence for possessing 200 or more "user units" of LSD. By referring to user or dosage units, those subparagraphs imply that they are limited to marketable mixtures or substances. Those related subsections reinforce what the terms deliver and possession imply: The reference to a mixture or substance in ORS 475.996(1)(a) and (2)(b) is limited to marketable mixtures or substances.

[8] Although "deliver" and "manufacture" point in different directions, the statute conjoins those two words. It authorizes an enhanced sentence for the "delivery or manufacture" of "ten grams or more of a mixture or substance containing a detectable amount of methamphetamine." ORS 475.996(1)(a)(C). The single phrase "mixture or substance" thus has a different connotation depending on whether it is read with "delivery" or "manufacture."

[9] The state does not dispute that *Chapman* is a prior construction for the purposes of *Stockfleth / Lassen*.

notes, the Court explained in *Chapman* that, in enacting the federal sentencing guidelines, Congress "adopted a 'market-oriented' approach" in which the length of a person's sentence is based on the "total quantity of what is distributed." 500 US at 461. Similarly, when addressing the defendant's due process challenge, the Court stated that the federal statute "measur[es] the quantity of the drugs according to the 'street weight' of the drugs in the diluted form in which they are sold[.]" *Id.* at 465. Defendant reasons that the discussion of the federal statute in *Chapman* reveals that only marketable mixtures or substances—those mixtures that are in a form ready to be sold—would be used to determine whether a defendant's sentence should be enhanced and that the Oregon legislature is presumed to have adopted that understanding when it modeled our statute on the federal law. *See Stockfleth / Lassen*, 311 Or at 50.

We agree with defendant that the Court's discussion of the federal statute in *Chapman* supports his position. We also note that a majority of the federal courts have read *Chapman* to mean that the phrase "a mixture or substance" is limited to marketable mixtures or substances.[10] Despite that understanding of *Chapman* and the presumption recognized in *Stockfleth / Lassen*, we are hesitant to give *Chapman*'s statements dispositive weight because the question presented in *Chapman* differs from the question presented here.

---

[10] *See United States v. Palacios-Molina*, 7 F3d 49, 54 (5th Cir 1993) (holding that the weight of cocaine mixed with sangria should not be used for sentencing because the cocaine was not part of a "marketable mixture"; only after the liquid was distilled out would the cocaine be ready for either the wholesale or retail market); *United States v. Salgado-Molina*, 967 F2d 27, 29 (2d Cir 1992) (same); *United States v. Jennings*, 945 F2d 129 (6th Cir 1991) (declining to use weight of mixture containing a small amount of methamphetamine and poisonous by-products because the mixture was not marketable); *United States v. Rolande-Gabriel*, 938 F2d 1231, 1237 (11th Cir 1991) (concluding that weight of liquor in which cocaine was distilled should not be used in weight calculation); *but see United States v. Walker*, 960 F2d 409, 412-13 (5th Cir), *cert den*, 506 US 967 (1992) (holding, in reliance on pre-*Chapman* precedents, that the total weight of waste water containing cocaine should be used to enhance a defendant's sentence); *United States v. Mahecha-Onofre*, 936 F2d 623 (1st Cir), *cert den*, 502 US 1009 (1991) (holding that the weight of a suitcase made from a cocaine-acrylic mixture should be used to determine the defendant's sentence).

The question in *Chapman* was whether the blotter paper on which LSD was distributed was a "mixture or substance," the weight of which should be included in determining whether the defendant possessed a substantial quantity of that drug.[11] There was no dispute in *Chapman* that, if the blotter paper were a mixture or substance, it was marketable. By contrast, in this case, there is no dispute that a reasonable juror could find that the liquid in the two jars was "a mixture or substance." Rather, the question here is whether the legislature intended that the phrase "mixture or substance" would refer to any mixture or substance or only those mixtures or substances that are marketable. Because that question was not squarely at issue in *Chapman*, we hesitate to say, in reliance on *Chapman* alone, that Oregon intended to limit the phrase "mixture or substance" to marketable mixtures or substances. We agree, however, with defendant that the text, considered in context, is ambiguous and turn to the legislative history. *See PGE*, 317 Or at 611-12.

ORS 475.996 was a "legislative fix" for a problem that we recognized in *State v. Moeller*, 105 Or App 434, 806 P2d 130, *rev dismissed*, 312 Or 76 (1991). The defendant in *Moeller* had challenged a sentencing guidelines rule that provided for enhanced sentences for drug offenses that " 'occurred as part of a drug cultivation, manufacture or delivery scheme or network.' " *See id.* at 437. We held that the phrase "scheme or network" violated Article I, sections 20 and 21, of the Oregon Constitution because it gave judges and juries unbridled discretion to determine the sort of conduct that would warrant a higher sentence. *Id.* at 439-41.

Following *Moeller*, Representative Tom Mason introduced a bill to replace the "scheme or network" rule with a more specific test. As initially proposed, the bill provided for a presumptive prison sentence if a person either delivered certain controlled substances for consideration or if the state

---

[11] The defendant in *Chapman* argued that the blotter paper was a carrier medium, comparable to packaging material, that should not be considered a mixture or substance. The defendant also noted that LSD was sold by the dose, rather than by weight, and that using the weight of the blotter paper to determine the length of his sentence produced an arbitrary result.

proved specific factors, such as the presence of stolen property, a substantial amount of cash, or a substantial amount of controlled substances. Minutes, House Committee on Judiciary, Subcommittee on Crime and Corrections, HB 2390, Jan 30, 1991, 2, 5 (testimony of Rep Tom Mason). There was some concern that the specific factors were themselves vague, and Judge Harl Haas mentioned that the committee might want to look at the federal sentencing guidelines as a way of defining which drug crimes should be subject to an enhanced sentence. *Id.* at 4-5.

On February 20, 1991, the Oregon District Attorneys Association (ODAA) pursued the approach that Judge Haas had mentioned. It proposed amending HB 2390 to correspond with the federal sentencing guidelines, and the ODAA's proposed amendment became, with some changes, what is now ORS 475.996(1). *See* Ex D, House Committee on Judiciary, Subcommittee on Crime and Corrections, HB 2390, Feb 20, 1991 (setting out the ODAA amendment). The ODAA's amendment provided, as ORS 475.996(1) now provides, for enhanced sentences for delivering or manufacturing specified amounts of mixtures or substances containing detectable amounts of certain controlled substances.

Norm Frink, a representative for the ODAA, told the subcommittee why the district attorneys association had proposed the amendment:

> "First, instead of speaking solely in terms of a quantity of a drug, we spoke in terms of a mixture or compound with detectable amounts of the drug. Now, this change is I think a very significant change in terms of actual operation of law. It is based on the federal experience that it has been almost impossible to litigate quantities and that type of thing. It is also based on my brief discussions with the crime lab where they estimate that if we went to a system where the crime labs around the state had to determine the quantity—in other words, you had to show that there was exactly five grams of actual heroin, as opposed to five grams of heroin and 10 percent of cut, or something like that— they estimate that the budgetary expenses necessary to prepare lab reports in that fashion might be in excess of $500,000.

"So, both the experience in federal court and the projections that I received from the crime lab argued for that change, and that was the reason for that change.

"The second change was going to the specific amounts laid out in subsection 1, which made certain deliveries or manufactures presumptively prison based simply on the quantity of the substance involved. And what we tried to do was to make the quantities in reasonable relation to each other based on street value. We took the first quantity that the committee had laid out—5 grams of heroin—and we attempted to lay out quantities of these other substances that were more or less appropriate to that in terms of street value and magnitude of operation so that there would be a consistency between the various drugs. We also, as the committee would note, added several drugs that we felt in high quantities were deserving of presumptive prison treatment."[12]

Tape Recording, House Committee on Judiciary, Subcommittee on Crime and Corrections, HB 2390, Feb 20, 1991, Tape 30, Side A (testimony of Norm Frink).

As Frink noted, the amendment (and the bill that was later enacted) provides, for example, for a presumptive prison sentence if a manufacturing or delivery offense involves: (1) five grams or more of a mixture or substance containing heroin; (2) 10 grams or more of a mixture or substance containing cocaine; (3) 10 grams or more of a mixture or substance containing methamphetamine; (4) 150 grams or more of a mixture or substance containing marijuana; or (5) 200 user units or more of LSD. *See* Ex D, House Committee on Judiciary, Subcommittee on Crime and Corrections, HB 2390, Feb 20, 1991, 2 (setting out the ODAA amendment). Frink also explained how the association arrived at the amount of each mixture or substance that will result in an enhanced sentence. It used the street value of each mixture or substance to determine the amount that would be

___

[12] In addition to providing for a presumptive prison sentence if a defendant possessed more than a specified quantity of certain controlled substances, the amendment provided for the same sentence if the crime was a "commercial drug offense." The amendment used the types of factors set out in the original bill (factors associated with drug trafficking) to identify a commercial drug offense. *See* Ex D, House Committee on Judiciary, Subcommittee on Crime and Corrections, HB 2390, Feb 20, 1991, 3. That aspect of the amendment is not at issue here.

equivalent to the street value of a mixture or substance containing five grams of heroin; that is, the calculation that resulted in the amount of each mixture or substance set out in the text of the bill is based on the understanding that each mixture or substance is in a form ready to be sold on the street.

The state argues that we should give Frink's comments regarding "street value" little weight because they "were related to the relative threshold quantities proposed for each drug; they did not relate to the purpose of the 'mixture or substance' language or to the general purposes of the substantial-quantities factor." Additionally, the state contends that his remarks should be discounted because they were merely the comments "of a single witness in a single hearing." On the first point, we note that the amount of each mixture or substance that will warrant an enhanced sentence was based on an understanding about the nature of the mixture or substance that was to be measured. That understanding informs our analysis of the sort of mixture or substance that the legislature had in mind when it enacted House Bill 2390. On the second point, an examination of the remainder of the legislative history demonstrates that Frink's comments were not isolated remarks. Rather, the understanding that informs his testimony recurs throughout the remainder of the hearings.

In the Senate, much of the discussion focused on the amount of a controlled substance that would warrant an enhanced sentence; the committee members wanted to distinguish an amount that was consistent with personal use from an amount that was consistent with selling controlled substances. Minutes, Senate Committee on Judiciary, HB 2390, May 24, 1991, 13. For example, Senator Hamby wanted to know whether "[t]en grams is less than a week's supply of meth." *Id.* at 14. When the representative from the Oregon Criminal Defense Lawyers Association explained that it would be a week's supply "[f]or someone who's doing a lot of meth," Senator Hamby asked what a normal dose would be. *Id.*

Similarly, when one of the senators asked how long five grams of uncut heroin would last, the witness explained

that the amounts of drugs listed in the bill that would enhance a person's sentence were based on the "street level variety" of those drugs. *Id.* at 17. The senator responded, "So we drive policy by identifying street level drugs." *Id.* at 18. When questioned on this point, John Bradley, a deputy district attorney from Multnomah County, explained that the sentencing statutes for most other states and the federal government were based on "the weights of what is sold and possessed." *Id.* at 19-20. Bradley explained that the federal approach had proved successful, *id.*, and the committee ultimately agreed with him. *See* Minutes, Senate Committee on Judiciary, HB 2390, June 12, 1991, 8-9.[13]

Throughout the legislative history, the legislators acted on the understanding that the "mixtures or substances" that would be measured to determine a person's sentence were marketable mixtures or substances. Not only did the ODAA representative explain to the House subcommittee that the specific amounts of each mixture or substance set out in the amendment had been determined using their "street values," but the legislators in the Senate sought to determine the amount of drugs that would distinguish trafficking from personal use. That is, the legislators looked to the marketable form of mixtures or substances containing controlled substances in determining the amount of each mixture or substance that would warrant a presumptive prison sentence. Reading the text, context, and legislative history together, we conclude that, when the Oregon legislature modeled ORS 475.996 on the federal statute, it intended to enhance a defendant's sentence only for marketable mixtures or substances—a holding that is consistent with the discussion of the federal sentencing laws in *Chapman* and the majority of the federal courts that have specifically considered the issue.[14] We accordingly vacate defendant's sentences on counts 1, 3, and 5 and remand for resentencing. We

---

[13] As amended in the Senate, the bill provided for treatment for certain drug offenders. The House did not accept those changes, and a conference committee was convened, which recommended that the Senate amendments be adopted. The conference committee did not consider any of the issues raised here.

[14] We express no opinion on the question whether the addition of the phrase "its salts, isomers or salts of its isomers" to ORS 475.996(1)(a)(C) in 2001 would lead to a different result for those persons who manufacture or deliver methamphetamine after the effective date of that amendment. *See* n 6 above.

also remand the remainder of defendant's convictions for resentencing. *See* ORS 138.222(5).

Sentences on counts 1, 3, and 5 vacated and remanded for resentencing; counts 2, 4, 6, and 13 remanded for resentencing; otherwise affirmed.